J-S39043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: S.L.A., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: K.E.N., MOTHER | :<br>:<br>:<br>:<br>:<br>: |
| | : No. 835 WDA 2024 |

Appeal from the Decree Entered June 12, 2024
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  43-ADOPT-2023

| | |
|---|---|
| IN RE: ADOPTION OF M.A., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>: |
| APPEAL OF: K.E.N., MOTHER | :<br>:<br>:<br>:<br>:<br>: |
| | : No. 836 WDA 2024 |

Appeal from the Decree Entered June 12, 2024
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  42-ADOPT-2023

| | |
|---|---|
| IN RE: ADOPTION OF L.A., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>: |
| APPEAL OF: K.E.N., MOTHER | :<br>:<br>:<br>:<br>:<br>: |
| | : No. 837 WDA 2024 |

Appeal from the Decree Entered June 12, 2024
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  44 Adopt 2023

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                **FILED: January 17, 2025**

K.E.N. (Mother) appeals from the decrees terminating her parental rights to M.A. (born in September of 2012), S.L.A. (born in December of 2019), and L.S.A.[1] (born in July of 2021) (collectively, Children).[2] On appeal, Mother contends that Fayette County Children and Youth Services (the Agency) failed to establish by clear and convincing evidence the grounds to terminate her parental rights. We affirm.

The trial court summarized the facts and procedural history of this appeal as follows:

> The Agency and the . . . dependency court has a history with this family since 2013 for concerns of parental conduct that placed M.A. at risk and inadequate shelter. [M.A.] was only one (1) year of age when she was adjudicated dependent. The case was closed on January 2, 2014. In June of 2021, [M.A.] was taken to the hospital for a vaginal infection. She was eight (8) years old. . . . That case was closed on June 28, 2021. Thereafter, on September 27, 2021, information was divulged that [M.A.] had been sex trafficked by maternal grandmother from age five (5). On October 13, 2021, [M.A.] disclosed multiple [instances of] sexual abuse with multiple perpetrators and described in detail the events. Per interview by the Attorney General [on] October [19,] 2021, [Mother and L.A. (Father) (collectively, Parents)] apparently knew of the sex trafficking and that sexual abuse had occurred. The [dependency] court placed [M.A.] in foster care by emergency

_____

[1] Father and one of the children, L.A., share the same initials. Throughout this memorandum, we will refer to the child as L.S.A.

[2] Father's parental rights to Children were terminated on the same date. Father filed separate appeals from the termination decrees for S.L.A. and L.S.A., which we will address in a separate memorandum.

order dated October 19, 2021. Th[e dependency] court also placed [S.L.A.] and [L.S.A.] . . . in foster care.

Trial Ct. Op., 8/13/24, at 3 (some formatting altered).

The dependency court adjudicated the Children dependent on October 28, 2021. *See id.* The dependency orders permitted Mother to have supervised visitation with S.L.A. and L.S.A., but Mother was not permitted to have any visitation with M.A. *See id.* This remained the visitation arrangement throughout the underlying dependency matter. *See* N.T. Hr'g (afternoon), 4/16/24, at 9, 38; N.T. Hr'g (morning), 4/17/24, at 53.

Initially, Children were all placed in the same foster home. *See* N.T. Hr'g (afternoon), 4/16/24, at 9. A few days later, M.A. was then placed in foster care with K.G., and she has remained there throughout the underlying dependency matter. *See id.* at 9, 26, 74. In February of 2022, Agency placed S.L.A. and L.S.A. in foster care with S.G. and M.G., and they have remained in this foster home through the dates of the termination hearings. *See id.* at 31, 74; N.T. Hr'g (morning), 4/17/24, at 37-38.

The dependency court ordered Mother to, among other things, "have a mental health assessment and treatment[,] if recommended[;] address domestic violence concerns[;] undergo anger management treatment . . . meet the daily needs of the children[;] maintain a bond with the children[;] and complete parenting classes." Trial Ct. Op., 8/13/24, at 3-4.

The trial court further explained that

[o]n December 15, 2021, the Agency received, and the

- 3 -

[dependency] court reviewed a disturbing video[3] of Father hitting, kicking and extremely verbally assaulting [M.A.] in the presence of [S.L.A.]. Mother filmed the abuse as an outraged Father hit, kicked and screamed profanity at [M.A.] calling her despicable names such as "whore." [M.A.] appears to cower and to futilely [attempt to] escape the abuse. . . .

*Id.* at 4 (some formatting altered); *see also* N.T. Hr'g (afternoon), 4/16/24, at 19-20, 23-24 (testimony of Mallory Varndell, an Agency caseworker); *id.* at 29, 46-49 (testimony of Jennifer Guesman, an Agency caseworker). Parents were subsequently charged with simple assault and endangering the welfare of children.[4] *See* Trial Ct. Op., 8/13/24, at 4.

Throughout the ensuing dependency proceedings, the dependency court conducted regular review hearings and maintained Children's commitment and placement. On July 20, 2023, the Agency filed petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court held evidentiary hearings on April 16, 2024, April 17, 2024, May 23, 2024, and June 12, 2024. Mother was present and

---

[3] While admitted as an exhibit, a copy of this video was not included with the certified record. No party is challenging the contents or authenticity of this video. Therefore, given the descriptive nature of the testimony regarding this video and incident, this omission does not hamper our review. We, however, remind counsel that it is an appellant's "responsibility to provide a complete certified record on appeal." *In re J.F.*, 27 A.3d 1017, 1023 n.10 (Pa. Super. 2011) (citations and quotation marks omitted); *see also* Pa.R.A.P. 1921, Note (stating "[u]ltimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials" (citation omitted)).

[4] The certified record does not contain any evidence regarding the outcome of the criminal proceedings against Mother.

represented by counsel. Children, then eleven, four, and three years old, respectively, were represented by a guardian *ad litem* (GAL), Kimberly Kovach, Esquire.

At the hearings, the Agency presented testimony from M.A.'s therapist, Megan Petak; Agency caseworkers Mallory Varndell, Jennifer Guesman, Alexandria Paull, Jennifer Hamilton, and Marissa Engle; surveillance investigator John Oldham; Justice Works Youth Care program director Laura Daumit, Justice Works Youth Care caseworker Lisa McDaid; and Carolyn Menta, Psy.D., a licensed psychologist. Mother presented testimony from her therapist, Kathleen Davenport; Twila Johnson, a visitation supervisor at Justice Works Youth Care Center; and Robert Ritchie, a social service intervention provider for PurVue Individual and Family Services. Mother did not testify on her own behalf.

The trial court accepted Ms. Petak as an expert in trauma-focused cognitive behavioral therapy and child and adolescent trauma therapy. ***See*** N.T. Hr'g (morning), 4/16/24, at 10-11. Ms. Petak testified that the Agency referred M.A. to her for trauma therapy in November of 2021. ***See id.*** at 11. Ms. Petak diagnosed M.A. with generalized anxiety disorder. ***See id.*** at 35. When M.A. began therapy, she had poor grades, struggled with her peers, had difficulty forming an attachment to K.G., her foster mother, and struggled with feeling safe in the community. ***See id.*** at 13. M.A.'s condition has since improved, and she is well-adjusted with increased self-esteem. ***See id.*** at 15, 21.

Ms. Petak opined that M.A. has been traumatized by Father's physical abuse and by Mother allowing that abuse to occur. *See id.* at 17, 26-30. After unintentionally encountering Parents on two occasions, M.A. cried, had difficulty sleeping, engaged in negative self-talk, and engaged in self-harm. *See id.* at 13-14, 21-22; *see also* N.T. Hr'g (morning), 4/17/24, at 56 (testimony of Ms. Engle, an Agency caseworker). Prior to the bonding assessment, Ms. Petak discussed the possibility of M.A. having visitation with Parents. *See* N.T. Hr'g (morning), 4/16/24, at 15. M.A. had a negative emotional reaction to the idea, but did not engage in self-harm. *See id.* After the bonding assessment with Mother, M.A. cried, slept on the floor, and had trouble in school, but did not engage in self-harm. *See id.* at 22, 31; N.T. Hr'g (morning), 4/17/24, at 79. Ms. Petak explained that M.A. "loves her parents as any child loves their parents but does not wish to return" to their custody. N.T. Hr'g (morning), 4/16/24, at 23.

Ms. Petak opposed M.A. having contact with Mother in the future and opined that termination of Mother's parental rights was in M.A.'s best interest. *See id.* at 17-18, 22-23. Specifically, Ms. Petak explained that Mother and M.A. "have not had a connection in over 3 years. There . . . is not a healthy bond. She has an . . . anxious attachment with [] Mother where [M.A.] exhibits parentified behaviors" and that M.A.'s attachments to Mother were not positive or healthy. *Id.* at 18; *see also id.* at 23-24, 32-33.

The trial court recognized Dr. Menta as an expert in psychology. *See* N.T. Hr'g (afternoon), 4/17/24, at 49. Dr. Menta performed a psychological

evaluation of M.A. in June of 2023. **See** N.T. Hr'g (afternoon), 4/17/24, at 49, 51. Dr. Menta diagnosed M.A. with post-traumatic stress disorder ("PTSD"). **See id.** at 53; **see also** Agency Exhibit 9 at 8 (Dr. Menta's psychological evaluation of M.A.). Dr. Menta explained that M.A. exhibits "significant trauma symptoms, including intrusive thoughts, severe anxiety, emotional lability, being easily startled or frightened, self-injurious behavior, angry outbursts, dissociation, and overwhelming guilt and shame." **See** Agency Exhibit 9 at 9. Notably, M.A.'s symptoms became aggravated after she came into physical contact with Parents on two occasions. **See id.** Therefore, Dr. Menta concluded "that contact with her parents is likely to cause significant exacerbation of her trauma symptoms, as well as behavioral regression." **See id.**

In February of 2024, Dr. Menta conducted a bonding assessment for M.A., in which she first observed M.A.'s interactions with Mother and then observed M.A. interacting with K.G. (foster mother). N.T. Hr'g (afternoon), 4/17/24, at 68-70. In her bonding assessment report, Dr. Menta opined that M.A. "has some degree of bond with [] Mother, albeit a rather anxious attachment."[5] Agency Exhibit 13 at 6; **see also** N.T. Hr'g (afternoon), 4/17/24, at 71. By contrast, Dr. Menta testified that M.A.'s "relationship with her foster mother[, K.G.,] is excellent. She's clearly able to talk about very

---

[5] Dr. Menta described "anxious attachment" as children who "crave love and affection from their parents, but at the same time have difficulty trusting and feeling secure in that relationship." Agency Exhibit 13 at 6.

difficult topics with [K.G.]. She has a good deal of trust in her [foster mother] and she's really able to let her guard down around her. And my sense is that's a very secure attachment." N.T. Hr'g (afternoon), 4/17/24, at 71; *see also* Agency Exhibit 13 at 6. Dr. Menta concluded:

> It is in [M.A.'s] best interest to sever the anxious attachment with [M]other, and [M.A.] should be able to continue to benefit from the secure attachment she has formed with her foster mother[, K.G.]. Continuing in an environment where she is securely attached will help with healthy emotional development, good self-confidence and self-esteem and will help her to have healthier relationships later in life.

Agency Exhibit 13 at 6-7.

Regarding S.L.A. and L.S.A., several witnesses testified that S.L.A. and L.S.A. exhibit violent and/or self-injurious behaviors in connection with their supervised visitation sessions with Parents. This included screaming, banging their hands on surfaces, and S.L.A. pinching herself and pulling her hair. *See* N.T. Hr'g (afternoon), 4/17/24, at 17-18 (testimony of Ms. Daumit, program director at Justice Works), *id.* at 26-27, 31, 36, 38 (testimony of Ms. McDaid, a caseworker for Justice Works Youth Care); N.T. Hr'g, 5/23/24, at 36 (testimony of Mr. Ritchie, social service intervention provider for PurVue Individual and Family Services). S.L.A. and L.S.A. have also hit others or attempted to bite others during visits with Parents. *See* N.T. Hr'g (afternoon), 4/17/24, at 27, 31, 36 (testimony of Ms. McDaid).

Further, Agency caseworker Ms. Engle, testified:

> When I was in [Mother's] home [during a supervised visit], I observed [S.L.A., then age four,] rocking back and forth on the

bed screaming, "daddy," over and over again. The child was using a very dee[p] voice, almost like a growl. I tried to talk to her and she had growled at me. I had left the home, [and] sat in the car. I was parked in front of another reside[nce] at the time with my window down waiting for [the] visit to end. I could hear [S.L.A.] screaming for the rest of the visit and I observed Justice Works departing from the residence holding [S.L.A.] as she was screaming and kicking.

N.T. Hr'g (morning), 4/17/24, at 39. As a result, S.L.A. was referred for trauma therapy. **See id.** at 38, 55, 76.

S.L.A. and L.S.A. suffer from developmental and health conditions. S.L.A. has been diagnosed with attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. **See** Agency Exhibit 12 at 2. In addition, L.S.A. has been diagnosed with autism.[6] **See id**; **see also** N.T. Hr'g (morning), 4/17/24, at 89 (testimony of Ms. Engle). Whereas S.L.A. and L.S.A.'s foster parents were responsive to their varied mental health and medical needs, Mother was not receptive or involved, and she attended only two of fifteen medical appointments for L.S.A. **See** N.T. Hr'g (morning), 4/17/24, 37-40, 72-74, 92 (testimony of Ms. Engle).

In January of 2024, Dr. Menta conducted a bonding assessment of S.L.A. and L.S.A., who at that time were four and two years old, respectively. **See** N.T. Hr'g (afternoon), 4/17/24, at 64. Dr. Menta first observed the interactions between S.L.A. and L.S.A. and Parents, and then observed those

---

[6] L.S.A. was also diagnosed with a medical issue related to his skull prematurely closing, which was going to require future surgery to relieve the pressure, as well as ear, nose, and throat issues. **See** N.T. Hr'g (morning), 4/17/24, at 37-38, 72-74 (testimony of Ms. Engle, an Agency caseworker).

children's interactions with their foster parents, S.G. and M.G. **_See id._** at 64-67. Dr. Menta wrote in her report that S.L.A. and L.S.A. appeared "rather anxious in the presence of" Mother and Father, and both children exhibited anger and aggression. Agency Exhibit 12 at 5; **_see also_** N.T. Hr'g (afternoon), 4/17/24, at 65. Dr. Menta opined that that S.L.A. and L.S.A. both have an "insecure bond" with Mother. Agency Exhibit 12 at 5; **_see also_** N.T. Hr'g (afternoon), 4/17/24, at 67. Conversely, Dr. Menta stated that S.L.A. and L.S.A. "were notably much calmer and more relaxed with their foster parents[, S.G. and M.G.]." Agency Exhibit 12 at 5; **_see also_** N.T. Hr'g (afternoon), 4/17/24, at 66-67. She opined that both "children appear to have secure attachment to their foster parents." Agency Exhibit 12 at 5. Further, during the bonding assessment, S.L.A. said she wanted to see her "mommy" and when Father pointed at Mother, S.L.A. responded "No! I want to see my mother." **_Id._** at 4; **_see also_** N.T. Hr'g (morning), 4/17/24, at 57-58 (Ms. Engle testified that S.L.A. does not refer to Mother as "mom" and S.L.A. has referred to herself using her foster parents' surname).

Dr. Menta concluded:

The risks of severing [S.L.A.'s] and [L.S.A.'s] insecure attachment with [] Parents are far outweighed by the benefits of allowing the children to continue to enjoy their secure bond with their foster parents. Continuing in a family environment where they are securely attached will help with healthy emotional development, good self-confidence and self-esteem and will help them to have healthier relationships later in life.

Agency Exhibit 12 at 5-6 (some formatting altered).

- 10 -

Mother enrolled in biweekly mental health treatment at Family Behavioral Resources, and she is receiving medication for "bipolar one disorder." *See* N.T. Hr'g (afternoon), 4/16/24, at 59, 66 (testimony of Ms. Paull, an Agency caseworker) (some formatting altered). However, Mother told Ms. Engle, an Agency caseworker, that she was concerned about her inability to connect with her therapist and that she was not making progress. *See* N.T. Hr'g (morning), 4/17/24, at 33, 41. Ms. Engle recommended that Mother change therapists and that the Agency could assist Mother in obtaining different insurance if she found a therapist who was not covered by Mother's current insurance, but Mother declined to switch to a new therapist. *See id.* at 33, 41-42, 45-46. Mother completed thirty-four, two-hour Nurturing Parenting classes at Justice Works Youth Care between January and April of 2022. *See* N.T. Hr'g (afternoon), 4/17/24, at 5-6 (testimony of Ms. Daumit). However, Mother did not receive passing scores on the two tests she took after completing the classes. *See id.* at 5-8, 11, 15.

Dr. Menta also saw Mother on June 16, 2023 to conduct a parental capacity evaluation. *See* N.T. Hr'g (afternoon), 4/17/24, at 55; *see also* Agency Exhibit 10 (Dr. Menta's parental capacity evaluation for Mother). Mother displayed "significant mental health concerns." Agency Exhibit 10 at 8. Dr. Menta diagnosed Mother with unspecified personality disorder and generalized anxiety disorder. *See id.* at 8; *see also* N.T. Hr'g (afternoon), 4/17/24, at 59 (testimony of Dr. Menta); N.T., 5/23/24, at 3-4 (Ms. Davenport, Mother's therapist, testified that she was treating Mother for

generalized anxiety disorder, bipolar disorder, and PTSD). Dr. Menta opined that Mother "demonstrates limited empathy for her children and lacks insight into her limitations as a parent." Agency Exhibit 10 at 8; *see also* N.T. Hr'g (afternoon), 4/17/24, at 60. Therefore, she recommended Mother continue to participate in therapy focused on coping, empathy, and insight, as well as medication management, and engage in parenting education. *See* Agency Exhibit 10 at 8; *see also* N.T. Hr'g (afternoon), 4/17/24, at 59-60.

After the parental capacity evaluation, the Agency required that Mother participate in additional parenting training, which she failed to do. *See* N.T. Hr'g (afternoon), 4/16/24, at 93-94, 102-03 (testimony of Ms. Hamilton, an Agency caseworker); N.T. Hr'g (morning), 4/17/24, at 51-52 (testimony of Ms. Engle).

By decrees dated and entered June 12, 2024, the trial court involuntarily terminated Mother's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother timely appealed from the decrees terminating her parental rights and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court filed an opinion addressing Mother's claims.

On November 13, 2024, this Court entered an order directing the trial court to determine whether there was any conflict between Children's best interests and legal interests, such that separate legal counsel would need to be appointed to represent Children's legal interests. *See* Order, 11/13/24, at 3 (citing, *inter alia*, **In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018)). The trial

court entered an order on November 22, 2024, indicating that there was no conflict between Children's best interests and legal interests. Accordingly, the merits of Mother's appeal are now ripe for our review.

Mother raises the following issues on appeal:

1. Did the trial court err when it terminated the parental rights of [Mother] pursuant to . . . 23 Pa.C.S. § 2511(a)(1)?

2. Did the trial court err when it terminated the parental rights of [Mother] pursuant to . . . 23 Pa.C.S. § 2511(a)(2)?

3. Did the trial court err when it terminated the parental rights of [Mother] pursuant to . . . 23 Pa.C.S. § 2511(a)(5)?

4. Did the trial court err when it terminated the parental rights of [Mother] pursuant to . . . 23 Pa.C.S. § 2511(a)(8)?

5. Did the trial court err when it terminated the parental rights of [Mother] pursuant to . . . 23 Pa.C.S. § 2511(b)?

Mother's Brief at 7-8 (some formatting altered).[7],[8]

Our standard of review is well-established:

---

[7] We observe that, despite consolidation, Mother filed three separate appellate briefs. Unless specified, all page references are taken from her brief filed at 835 WDA 2024 (the appeal with respect to S.L.A.).

[8] We note that Mother's brief lacks a summary of argument section and the argument section of her brief is mislabeled as the summary of argument section. *See* Mother's Brief at 19. We note that the Pennsylvania Rules of Appellate Procedure require that an appellate brief contain a summary of argument section. *See* Pa.R.A.P. 2111(a)(6), 2118. While we do not condone Mother's failure to comply with the Rules of Appellate Procedure, we find that the defect in Mother's brief does not impede our ability to render meaningful appellate review; therefore, we decline to find waiver on this basis. *See Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1042 (Pa. Super. 2015).

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.

*In re M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(2)

In her first issue, Mother contends that the trial court erred when it concluded that clear and convincing evidence existed to justify involuntarily terminating her parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). Mother's Brief at 19-25. Specifically, under Section 2511(a)(2), Mother argues that the Agency failed to meet its burden of proof. *Id.* at 20-22. Mother claims that she was "actively engaged with Justice Works Youth Care and Purvue services, which included [the] Nurturing Parenting curriculum and supervised" visitation with S.L.A. and L.S.A. *Id.* at 21. Mother also asserts that she was compliant with her mental health counseling and that she "continuously maintained appropriate housing." *Id.* at 21-22. Lastly, Mother argues that the evidence established that she "has been making and had been

continuing to make progress at the time of the termination decision[]" and that if there was any incapacity, abuse, neglect, or refusal, it "can be remedied and that Mother has been actively attempting to remedy those conditions." *Id.* at 22.

Section 2511(a)(2) provides as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

- 16 -

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.
>
> *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (internal citations and quotation marks omitted) . . . . Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [*A.L.D.*, 797 A.2d at 340]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

It is well-established that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Here, the trial court explained:

In this case, Mother . . . ha[s] been given years to prove [she] can reunify with [C]hildren, and it simply cannot be done. The past damage to [M.A.] by her parents in permitting and looking the other way when she was sex trafficked from age 5 through 8 is despicable conduct. Father, as caught on video, hitting, kicking and calling her foul sexually abhorrent names as she and [S.L.A.] hovered in fear is incapable of remedy. [C]hildren lived in an abusive and dangerous home with [P]arents. It is apparent from their reactions during visits and the testimony proffered by psychologists and therapists that continuation of forced contact with [P]arents will only cause such psychological trauma that will jeopardize their development into adulthood. The [trial] court is unwilling to permit further trauma [to] [C]hildren.

\*    \*    \*

[Mother has] failed to perform parental duties during the entire lives of [C]hildren and such repeated and continued incapacity and abuse has caused [C]hildren to be without parental care necessary for their physical and mental well-being. The conditions cannot and will not be remedied after years of the Agency's involvement. The conditions leading to removal cannot be remedied and termination would best serve the needs and welfare of [C]hildren.

Trial Ct. Op., 8/13/24, at 17-18 (some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court. *See M.E.*, 283 A.3d at 829. First, the record establishes that Children were exposed to abuse and trauma in the care of Mother as a result of her actions and inactions. *See* N.T. Hr'g (morning), 4/16/24, at 17, 26-30; N.T. Hr'g (afternoon), 4/16/24, at 4-7, 14-15, 19-20, 23-24, 29, 46-49. In particular, M.A. was subjected to horrific sexual abuse, physical abuse, and verbal abuse. *See* N.T. Hr'g (morning), 4/16/24, at 17, 26-30; N.T. Hr'g (afternoon), 4/16/24, at 4-7, 14-15, 19-20, 23-24, 29, 46-49.

As noted previously, Dr. Menta concluded that Mother displayed "significant mental health concerns" and that Mother demonstrated "limited

empathy for her children and lacks insights into her limitations as a parent." Agency Exhibit 10 at 8; **see also** N.T. Hr'g (afternoon), 4/17/24, at 60. Dr. Menta explained that a lack of empathy "raises the risk of abusive behaviors for both physical abuse, emotional abuse and even sexual abuse . . . . So, if you don't have empathy, there's very little motivation to curtail some of those angry behaviors, angry urges." N.T. Hr'g (afternoon), 4/17/24, at 79-80. Additionally, Dr. Menta testified that "if there's a lack of empathy, the child is going to feel as though they are not heard, their feelings are not taken into consideration, they're not appreciated. So, a child can develop a lot of insecurity from that." **Id.** at 80.

Mother completed a parenting program through Justice Works, but she did not receive passing scores for that program. **See** N.T. Hr'g (afternoon), 4/17/24, at 5-6, 8, 11, 15. After Dr. Menta recommended that Mother take additional parenting classes in her parental capacity evaluation, the Agency required that Mother participate in additional parenting training, which she failed to do. **See** N.T. Hr'g (afternoon), 4/16/24, at 93-94, 102-03; N.T. Hr'g (morning), 4/17/24, at 51-52. Significantly, as of the date of the termination of parental rights hearings the Agency had been providing Mother with services for over two years. We reiterate that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See Z.P.**, 994 A.2d at 1117-18; **see also R.J.S.**, 901 A.2d at 513 (explaining that "a child's life cannot be held in abeyance while a parent

attempts to attain the maturity necessary to assume parenting responsibilities").

For these reasons, we discern no abuse of discretion by the trial court in concluding that termination pursuant to Section 2511(a)(2) is warranted inasmuch as Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental care, control or subsistence. Further, the conditions and causes of Mother's incapacity, abuse, neglect or refusal cannot or will not be remedied. *See A.H.*, 247 A.3d at 443; *see also Z.P.*, 994 A.2d at 1117-18. For the reasons stated above, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(2).[9] Accordingly, Mother is not entitled to relief on this claim.[10]

_____

[9] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See B.L.W.*, 843 A.2d at 384.

[10] Mother has a fourth child, born in February of 2023, who remained in her custody at the time of the termination proceedings, and is not a subject of the instant appeals. *See* Trial Ct. Op., 8/13/24, at 3. Mother argues that her custody of her youngest child demonstrated that the conditions which led to M.A.'s placement no longer existed. *See* Mother's Brief (M.A.) at 27. This argument fails because the trial court did not place weight on the fact that Mother had an infant in her custody. *See* Trial Ct. Op., 8/13/24, at 17-18; *see also In re S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) (stating that "trial courts in termination cases should utilize the established relevancy test on a case-by-case basis when asked to assess the admissibility of evidence related to a parent's ability to care for a child other than the child who is subject to the termination proceeding. If the trial court deems the evidence to be relevant, then the evidence should be admitted into the record and the court,
*(Footnote Continued Next Page)*

## Section 2511(b)

Mother argues that the trial court erred when it involuntarily terminated Mother's parental rights to M.A. because the evidence established that M.A. desires to have a relationship with Mother, and although the relationship is "anxious, [it] is the type that Mother and M.A. could resolve."  Mother's Brief (M.A.) at 27.  Mother also contends that the trial court erred when it involuntarily terminated Mother's parental rights to S.L.A. and L.S.A. because Mother has continued to engage in visitation with S.L.A., L.S.A., and their sibling who is not the subject of these proceedings.  Mother's Brief (S.L.A.) at 26.  Mother contends that completely cutting off Mother's visitation with S.L.A. and L.S.A. would be contrary to their needs and welfare.  *Id.*

Section 2511(b) provides as follows:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

---

as fact-finder, should assign that evidence the appropriate weight to which it is entitled in reaching its factual and legal conclusions").

This Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent[s].

*In re C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (some formatting altered), *abrogated in part on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)). In *K.T.*, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the parent-child bond analysis must include "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation

omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care . . . whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *K.T.*, 296 A.3d at 1113 (footnote omitted and some formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Furthermore, the *K.T.* Court reaffirmed that caselaw "indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. For instance, if relevant, a trial court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014).

Here, the trial court explained:

[M.A.] requires stability and care in the home of her foster parents. [S.L.A.] and [L.S.A.] deserve the stability and care they also receive with their foster parents. The [trial court] finds that the best interests, needs and welfare of these children require

- 23 -

termination of parental rights and adoption into loving and stable homes, homes in which they are bonded to and secure.

Trial Ct. Op., 8/13/24, at 17.

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would best serve Children's needs and welfare. *See K.T.*, 296 A.3d at 1113; *T.S.M.*, 71 A.3d at 267-69.

Although M.A. expressed to her therapist, Ms. Petak, that she loves Mother, M.A. also stated that she does not want to return to Mother's custody. *See* N.T. Hr'g (morning), 4/16/24, at 23. Further, M.A. has experienced negative emotional and behavioral reactions after having contact with Mother. *See id.* at 13-14, 21-22; *see also* N.T. Hr'g (morning), 4/17/24, at 79-81 (testimony of Ms. Engle, an Agency caseworker). Ms. Petak opined that termination of Mother's parental rights was in M.A.'s best interest. *See* N.T. Hr'g (morning), 4/16/24, at 17-18, 22-23. Similarly, Dr. Menta, who conducted a bonding assessment of M.A. in February 2024, indicated that M.A. shared an "anxious, unhealthy" attachment with Mother in contrast to a "secure bond" with K.G., her foster mother. *See* Agency Exhibit 13 at 6; *see also* N.T. Hr'g (afternoon), 4/17/24, at 71. Therefore, Dr. Menta opined that it was in M.A.'s best interests to sever her bond with Mother and for M.A. to continue her relationship with K.G., her foster mother. *See* Agency Exhibit 13 at 6; *see also* N.T. Hr'g (afternoon), 4/17/24, at 71-72.

For these reasons, the record substantiates that although M.A. harbors some affection for Mother, M.A. does not share a "necessary and beneficial" relationship with Mother and instead shares such a relationship with K.G., her foster mother. Accordingly, we discern no abuse of discretion with the trial court's finding that the termination of Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of M.A. pursuant to Section 2511(b). *See K.T.*, 296 A.3d at 1113; *M.E.*, 283 A.3d at 829.[11]

As stated above, Dr. Menta opined in her bonding assessment of S.L.A. and L.S.A. that both of them have an "insecure bond" with Mother. Agency Exhibit 12 at 5; *see also* N.T. Hr'g (afternoon), 4/17/24, at 67. She also concluded that S.L.A. and L.S.A. "appear to have secure attachment to their foster parents[, S.G. and M.G.]" and that the benefits of continuing the bond between S.L.A. and L.S.A. and their foster parents outweighs the risks of severing their bond with Mother. *See* Agency Exhibit 12 at 5-6.

---

[11] Mother also argues that Agency failed to provide reasonable efforts to reunify Mother and M.A. *See* Mother's Brief (M.A.) at 27 (Mother contends that the Agency "never attempted to engage M.A. and Mother in therapy together to help adjust M.A. to [] Mother, nor did such possible therapy attempt to get to the root issues of Mother and [M.A.]"). This argument is without merit, because in termination of parental rights matters, courts are not required to consider whether the agency provided reasonable efforts to reunify a parent with a child. *See also In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (explaining that although "the provision or absence of reasonable efforts [by the agency] may be relevant to a court's consideration of both the grounds for termination and the best interests of the child[,]" "[n]either subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights" (citation omitted)).

Therefore, the record establishes that S.L.A. and L.S.A. do not share a "necessary and beneficial" relationship with Mother and instead have a secure attachment and familial relationship with their foster parents, S.G. and M.G. For these reasons, we discern no abuse of discretion in the trial court's finding that the termination of Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of S.L.A. and L.S.A. pursuant to Section 2511(b).  *See K.T.*, 296 A.3d at 1113; *M.E.*, 283 A.3d at 829.

Therefore, the trial court did not err in terminating Mother's parental rights.  *See M.E.*, 283 A.3d at 829.  For these reasons, we affirm.

Decrees affirmed.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

1/17/2025